## PEOPLE v BELL WILLIAMS

1. CRIMINAL LAW—JURY ARRAY—SELECTION—VOTER REGISTRATION LISTS.

   The use of voter registration lists to select potential jurors in criminal cases is constitutionally permissible and is no less unreliable than alternate methods which draw panels from economic, social, racial, and political groups.

2. CRIMINAL LAW—JURY ARRAY—VOTER REGISTRATION LISTS—SELECTION—DISCRIMINATION—BURDEN OF PROOF.

   A jury array for a criminal case drawn by the random selection of voter registration lists of the several political subdivisions of a county which allegedly underrepresents blacks on the juries from a city within the county was not improper and a defendant has not shown discrimination where the state has done nothing affirmatively to tailor the rolls to exclude blacks and has not shown that court officers in any way failed or refused to make use of the lists covering the city's ghetto in selecting potential jurors.

3. CRIMINAL LAW—JURY ARRAY—DISCRIMINATION.

   A defendant's contention in a criminal case that the jury array from which his panel was chosen had to include a percentage of blacks equal to their percentage in a city's population is not a tenable position because there would be a discriminatory inclusion and this would be just as objectionable as a discriminatory exclusion.

4. INDICTMENT AND INFORMATION—SCENE OF CRIME—ERROR IN IDENTIFICATION—PREJUDICE—ALIBI.

   A criminal information which identified the scene of a crime by apartment number rather than street address was not prejudicial to a defendant who claimed alibi because the defendant knew where the crime was allegedly committed and defend-

REFERENCES FOR POINTS IN HEADNOTES
[1] 47 Am Jur 2d, Jury § 136 *et seq.*
[2, 3] 47 Am Jur 2d, Jury §§ 163–176, 180–188.
[4] 41 Am Jur 2d, Indictments and Informations §§ 137–141.
[5] 65 Am Jur 2d, Rape §§ 20–22, 24.

ant's alibi could not have been prejudiced by the clerical error in the information.

5. RAPE—INTENT—EVIDENCE—PERMISSIBLE INFERENCE.

Intent to commit rape can be inferred from facts and circumstances and need not be shown directly, and where the facts were that a defendant saw a victim come to the door in her nightgown, the victim was naked when defendant broke into her bathroom, and the defendant dragged the naked victim into a bedroom and put his hand inside her vagina, such facts permit a rational inference that the defendant intended to rape the victim.

Appeal from Oakland, Farrell E. Roberts, J. Submitted Division 2 November 13, 1973, at Lansing. (Docket No. 16064.) Decided December 6, 1973.

Bell Williams was convicted of assault with intent to commit rape, and of breaking and entering an occupied dwelling house with intent to commit a felony. Defendant appeals. Affirmed.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, *L. Brooks Patterson,* Prosecuting Attorney, and *T. S. Givens,* Assistant Prosecuting Attorney, for the people.

*Powell, Peres, Carr, Jacques, Batchik & Schmidt,* for defendant.

Before: QUINN, P. J., and HOLBROOK and PETERSON,* JJ.

HOLBROOK, J. The defendant was convicted by a jury of assault with intent to commit rape, MCLA 750.85; MSA 28.280, and of breaking and entering an occupied dwelling house with intent to commit a felony therein, MCLA 750.110; MSA 28.305. The defendant was sentenced to concurrent terms of 6

---

* Circuit judge, sitting on the Court of Appeals by assignment.

to 10 years in prison for assault and 10 to 15 years in prison for breaking and entering, less 877 days already served.

After her husband had left for work at 6:10 in the morning on May 8, 1970, complainant went to let her pet poodle out for its daily constitutional. She "had on a bathrobe, pajamas, and slippers" at the time. She noticed a man standing at the bus stop across the street. Because the dog tended to bark and raise a commotion if people were outside, she did not put him out, but instead went upstairs to shower and dress for work. Although the storm door was ajar, the screen door was shut when she left.

She was drying off when she heard footsteps on the stairs. By their sound, she sensed it was not her husband. A strange man, whom she had not seen before and did not know, opened the bathroom door as she started to scream. He grabbed her around the neck and, after dragging her into the back bedroom, pushed her to a kneeling position on the floor in front of the bed. He then sat down on the edge of the bed facing her. Her assailant was still fully clothed, while she was nude. In an attempt "to make him let go of my neck * * * because I couldn't breathe anymore", she grabbed him in the privates to hurt him. He then "reached down and put his fingers inside me". At that point, she fainted. The intruder was gone when she came to at 6:35.

The complainant ran in terror to her next-door neighbor for help. No one was in her townhouse when the neighbor went over to investigate. She then called the police and reported the incident.

The same person tried to break into her house by the back door on June 4. As soon as she saw who it was, she ran upstairs and called her neigh-

bor again. He came right over, and together they watched the defendant prowl around for ten minutes or so. Then the neighbor called the police. However, when they came, no one was outside.

The next day, her husband stayed home with her. He saw the defendant at the bus stop across the street and, after ascertaining from his wife that he was her assailant, called the police. Officers Webb and Gordon responded to the call. The defendant told them that he was waiting to transfer to a bus to go to work at Ted's Restaurant. He did in fact work there. After the complainant swore out a warrant, the police arrested the defendant at work later that day.

The case was tried on September 15–19, 1972. At the close of the voir dire, all the defendant's peremptory challenges having been exhausted, and the jury still being all white, counsel challenged the constitutionality of the jury array. The court overruled the objection. Immediately after the complainant took the stand and gave her address for the record, the court noted the discrepancy in the address where complainant lived with that stated in the information, and granted the people's motion to amend it to correct the "clerical error". Defense counsel did not object. However, at the conclusion of the people's proofs, defendant's counsel moved to dismiss the charges on the grounds of a prejudicially inaccurate information, but was overruled. He then moved to dismiss the charges because the people had failed to prove intent to commit rape, but was again overruled. The jury subsequently returned a verdict of guilty. The defendant appeals.

I

*Whether the jury array based on voter registra-*

*tion lists systematically excludes a just proportion of black persons from serving as jurors, contrary to defendant's constitutional rights?*

There are no allegations here that Michigan utilizes county-wide voter lists as the pool from which jury arrays are called so as to discriminate against blacks and exclude them from juries. Therefore, cases such as *Whitus v Georgia,* 385 US 545; 87 S Ct 643; 17 L Ed 2d 599 (1967); *Whippler v Dutton,* 391 F2d 425 (CA 5, 1968); *Davis v Davis,* 361 F2d 770 (CA 5, 1966); and *Scott v Walker,* 358 F2d 561 (CA 5, 1966), are of no help to the defendant. This Court has repeatedly held that the use of voter registration lists to select potential jurors is a constitutionally permissible means of proceeding. It is no less unreliable than alternate methods that might be employed from the point of view of including all economic, social, racial, and political groups in the pool from which panels are drawn. *People v Robinson,* 41 Mich App 259, 262–263; 199 NW2d 878, 880 (1972); *People v Sinclair,* 30 Mich App 473, 483–484; 186 NW2d 767, 772 (1971); *People v Williams,* 29 Mich App 420; 185 NW2d 435 (1971); *People v Trice,* 22 Mich App 521; 178 NW2d 107 (1970).

Purposeful discrimination may not be merely assumed or asserted. It must be proven. Unlike the defendant in *Robson v Grand Trunk W R Co,* 5 Mich App 90; 145 NW2d 846 (1966), the defendant has not met that burden here. His sole basis for asserting exclusion of blacks from jury service is that segregated housing patterns confine blacks in Oakland County to the ghetto neighborhoods in Pontiac. Thus, although Oakland County as a whole is only 3.1% black, Pontiac is 26.7% black. The argument is that the state can be charged with knowledge of the demographic realities

within its political subdivisions. Therefore, since the jury array is drawn from throughout Oakland County rather than from Pontiac alone, the random selection procedure mandated by MCLA 600.1304; MSA 27A.1304 necessarily underrepresents blacks on the juries there.

In the use of voter lists that is challenged here, the state has done nothing to affirmatively tailor the rolls to exclude blacks. The jury array is drawn by random selection from voter registration lists submitted by the several political subdivisions of Oakland County. No showing is made that court officers in any way failed or refused to make use of the lists covering the Pontiac ghetto in selecting potential jurors. Defendant's contention is simply a claim that the array from which his panel was chosen had to include a percentage of blacks equal to their percentage of Pontiac's population. That is not a tenable position. Discriminatory inclusion is just as objectionable as discriminatory exclusion. *Collins v Walker,* 329 F2d 100, *reh den* a second time, 335 F2d 417 (CA 5), *cert den sub nom Hanchey v Collins,* 379 US 901; 85 S Ct 189; 13 L Ed 2d 175 (1964).

## II

*When a criminal information identifies the scene of the crime by apartment number rather than street address, is a defendant intending to raise an alibi defense thereby prejudiced?*

The record in this case is plain that the information's reference to Bloomfield Terrace identified complainant's apartment building. Even though the street address was not given, the defendant knew where the crime was allegedly committed. Indeed, when the police responded to complain-

ant's call for help on May 8, 1970, they had no trouble finding her apartment when the dispatcher gave them the Bloomfield Terrace address. In the circumstances, the defendant's alibi could not have been prejudiced by this clerical error in the information. *People v Potts,* 44 Mich App 722; 205 NW2d 864 (1973).

### III

*Did the proofs at trial furnish evidence to support the jury's finding of intent to commit rape?*

The intent to commit rape can be inferred from facts and circumstances and need not be shown directly. *People v Phillips,* 385 Mich 30, 37; 187 NW2d 211, 214 (1971).

The facts permit a rational inference that the defendant intended to rape the complainant. He saw her come to the door in her nightgown. She was naked when he broke into the bathroom. He dragged her naked into the bedroom and put his hand inside her vagina. This evidence was competent to support the verdict. *People v Szczytko,* 40 Mich App 161, 175; 198 NW2d 740, 749 (1972).

Affirmed.

All concurred.