349 So.2d 67 (1977)
Leonard MANSON
v.
STATE.
1 Div. 667.
Court of Criminal Appeals of Alabama.
April 19, 1977.
Rehearing Denied June 7, 1977.
*70 Ralph Kennamer, Mobile, for appellant.
*71 William J. Baxley, Atty. Gen., and Frederick S. Middleton, III, Asst. Atty. Gen., for the State.
PER CURIAM.
Appellant was convicted of a willful violation of Section 1 of the Securities Act of Alabama, Acts 1959 p. 1318, Act No. 542, § 1 (Code of Alabama, Recompiled 1958, 1973 Cum.Supp., Tit. 53, § 28). The jury assessed a fine of five thousand dollars, and the court imposed a sentence of imprisonment in the penitentiary for two and one-half years, both within the limits of the amended Act. Acts 1971 p. 3598, § 3 (Code of Alabama, Recompiled 1958, Cum.Supp. Tit. 53, § 44).
Appellant vigorously presents three contentions for a reversal: (1) the trial court was in error in overruling appellant's demurrer to the indictment; (2) certain exhibits and testimony were erroneously admitted in evidence; and (3) defendant was entitled to a directed verdict and acquittal "on the ground, among others, that the State had failed to prove venue in Mobile County, Alabama."
For a better understanding of the issues on appeal, and our consideration thereof, particularly the contention as to the sufficiency of the indictment as challenged by the demurrer, we set forth the indictment, consisting of three counts, in full. Each count commences as follows:
"The Grand Jury of Mobile County charge that, before the finding of this indictment, Leonard Manson, alias Lonnie Manson, alias Lennie Manson, whose true name is unknown otherwise than stated, hereinafter referred to as Defendant, in connection with the offer, sale, or purchase of a security, or securities, to-wit: certain bonds issued by, to-wit: The Industrial Development Board of the Town of Mt. Vernon, Alabama, said town being a municipal corporation organized under the laws of the State of Alabama, and said bonds being designated on the face thereof, to-wit: Industrial Development Revenue Bond (Johnnie Walker Medical Electronics, Inc., Project), Series A, 1974,. . ." Thereafter, as hereinafter shown as to each count, the indictment alleges as follows:

"COUNT I
". . . did, willfully and unlawfully, either directly or indirectly, employ a device, scheme, or artifice to defraud said Industrial Development Board, or the investing public, or bond purchasers, to-wit: Walter Poole, or other persons, as follows, to-wit: said Defendant willfully and unlawfully caused or allowed said Industrial Development Board to authorize the issuance or sale of said bonds in the amount of four million dollars ($4,000,000.00) in order to finance the construction and equipping of a plant or building in or near Mt. Vernon, Alabama for, to wit: Johnnie Walker Medical Electronics, Inc., also known as the Johnnie Walker Project, and said Defendant knew that said bonds in the amount of four million dollars ($4,000,000.00) was substantially more than was necessary to construct and equip said Johnnie Walker Project; said Defendant willfully and unlawfully falsely stated or omitted to state material facts concerning the corporate structure, ownership, or financial condition of Johnnie Walker Medical Electronics, Inc., an Alabama corporation, or Johnnie Walker Medical Electronics, Inc., a Missouri corporation; as a part of said device, scheme, or artifice to defraud, said Defendant willfully and unlawfully established himself as, or accepted the position of, agent for the said Johnnie Walker Medical Electronics, Inc., an Alabama corporation, and said Defendant controlled by himself, or jointly with another, the disbursement of said bond money or proceeds; and in furtherance of said device, scheme, or artifice to defraud, said Defendant used a portion of said bond proceeds for himself, or for another, or for purposes other than for the said Johnnie Walker Project, to-wit: as operating capital for to-wit: World Capital Investment Corporation; all in connection with the offer, sale, or purchase of said bonds, and against the peace and dignity of the State of Alabama.

*72 "COUNT II
". . . did, willfully and unlawfully, either directly or indirectly, to said Industrial Development Board or the investing public, or bond purchasers, to-wit: Walter Poole or other persons, make an untrue statement of a material fact, or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, as follows, to-wit: said Defendant willfully and unlawfully stated that, to-wit: said bonds in the amount of four million dollars ($4,000,000.00) was necessary to construct and equip a company or plant, in or near Mt. Vernon, Alabama, for, to-wit: Johnnie Walker Medical Electronics, Inc., also known as the Johnnie Walker Project; said Defendant willfully and unlawfully omitted to state material facts concerning the corporate structure, ownership, or financial condition of said Johnnie Walker Medical Electronics, Inc., an Alabama corporation, and Johnnie Walker Medical Electronics, Inc., a Missouri corporation; said Defendant willfully and unlawfully omitted to state an itemized list of expenditures to be made from said bond proceeds in connection with the said Johnnie Walker Project; said Defendant willfully and unlawfully omitted to state that a portion of said bond proceeds would be used for purposes other than for the said Johnnie Walker Project, to-wit: as operating capital for to-wit: World Capital Investment Corporation; said Defendant willfully and unlawfully omitted to state that, to-wit: Garet Van Antwerp, who served as attorney for said Industrial Development Board, also served in an advisory capacity, or as attorney for, or incorporated Johnnie Walker Medical Electronics, Inc., an Alabama corporation, the lessee of said Johnnie Walker Project; said Defendant willfully and unlawfully omitted to state that, to wit: Martin Bieber, who was to receive an attorney's fee from proceeds of said bonds, had previously been permanently enjoined by legal process from, to-wit: participating in the fraudulent sale or purchase of securities; said Defendant willfully and unlawfully omitted to state that the alleged contractor for the said Johnnie Walker Project, to-wit: Earl Hensley or Hensley Contractors, Inc., an Alabama corporation, had not been licensed as a general contractor as required by the laws of the State of Alabama; all in connection with the offer, sale, or purchase of said bonds, and against the peace and dignity of the State of Alabama.

"COUNT III
". . . did, willfully and unlawfully, either directly or indirectly, engage in an act, practice, or course of business which operated, or would have operated, as a fraud or deceit upon said Industrial Development Board, the investing public, or bond purchasers, to-wit: Walter Poole, or other persons, as follows, to-wit:
"(1) Said Defendant was a subscriber of, and held himself out to be the major stockholder of, to-wit: Johnnie Walker Medical Electronics, Inc., an Alabama corporation, which corporation agreed to locate or establish a plant or building in or near Mt. Vernon, Alabama, also known as the Johnnie Walker Project, said Johnnie Walker Project to be financed by the sale of said bonds in the amount of, to wit: four million dollars ($4,000,000.00); said Defendant, for or on behalf of said Johnnie Walker Medical Electronics, Inc., an Alabama corporation, guaranteed said bonds, or the principle and interest due thereon, but willfully and unlawfully failed to disclose to said Industrial Development Board, the investing public, or bond purchasers, to-wit: Walter Poole, or others, that said Johnnie Walker Medical Electronics, Inc., a newly formed Alabama corporation, had little or no corporate assets, or that said corporation had little or no funds for said Johnnie Walker Project other than said bond proceeds; said Defendant acted as a principal of said Johnnie Walker Project, but willfully and unlawfully failed to disclose to said Industrial Development Board, the investing public, or bond purchasers, to-wit: Walter Poole, or others, that said Defendant's *73 consultants or legal advisors, to-wit: Stewart Hopps, Garet Van Antwerp and Martin Bieber, had previously been permanently enjoined by legal process from, to-wit: participating in the fraudulent sale or purchase of securities; or
"(2) Knowing that said bonds in the amount of, to-wit: four million dollars ($4,000,000.00) was substantially more than necessary to construct and equip said Johnnie Walker Project, said Defendant willfully and unlawfully established himself as, or accepted the position of, the agent for said Johnnie Walker Medical Electronics, Inc., an Alabama corporation, designated to approve disbursements from said bond proceeds, in order to use, and said Defendant did in fact use, a portion of said proceeds for purposes other than for said Johnnie Walker Project, to-wit: as operating capital for, to-wit: World Capital Investment Corporation; all in connection with the offer, sale, or purchase of said bonds, and against the peace and dignity of the State of Alabama."
The counts of the indictment are seriated with Tit. 53, § 28, Code of Alabama, Recompiled 1958, 1973 Cum.Supp., which provides:
"(a) It is unlawful for any person, in connection with the offer, sale or purchase of any security, directly or indirectly
(1) to employ any device, scheme, or artifice to defraud,
(2) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, or
(3) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person."
The quoted provision of the statute is in all respects, other than in the insertion of the word "offer" and that which is necessary to a delineation between the area of sovereignty of Alabama and that of the United States, identical with the language of Rule 10b-5 [17 C.F.R. § 240.10b-5] of the Securities and Exchange Commission pursuant to its authority under the Securities Act of 1933 (15 U.S.C. § 77a, et seq.) and the Securities Exchange Act of 1934 (15 U.S.C. § 78a, et seq.).
Legislators of most of the states were forerunners (some by more than two decades) of members of Congress in enacting proscriptions to protect the public against exploitation by unscrupulous issuers and dealers in securities. 69 Am.Jur.2d, Securities Regulations Federal § 1. Professor Loss dates state enactments on the subject from 1911, by the State of Kansas.[1] The first general federal law on the subject was the Securities Act of 1933, 15 U.S.C. § 77a, et seq. Even so, the state laws did not escape federal judicial consideration for a long time. The question of due process under the Fourteenth Amendment was soon raised. Against such an attack the Supreme Court upheld the "Blue Sky Law" of Ohio. Hall v. Geiger-Jones Co., 242 U.S. 539, 37 S.Ct. 217, 61 L.Ed. 480 (1916). At 242 U.S. 550, 37 S.Ct. at 220, the Supreme Court said:
"It will be observed, therefore, that the law is a regulation of business, constrains conduct only to that end, the purpose being to protect the public against the imposition of unsubstantial schemes and the securities based upon them. Whatever prohibition there is, is a means to the same purpose, made necessary, it may be supposed, by the persistence of evil and its insidious forms and the experience of the inadequacy of penalties, or other repressive measures. The name that is given to the law indicates the evil at which it is aimed; that is, to use the language of a cited case, `speculative schemes which have no more basis than so many feet of "blue sky;"` or, as stated by counsel in another case, `to stop the sale of stock in fly-by-night concerns, visionary oil wells, distant gold mines, and other like fraudulent exploitations.' Even if *74 the descriptions be regarded as rhetorical, the existence of evil is indicated, and a belief of its detriment; and we shall not pause to do more than state that the prevention of deception is within the competency of government, and that the appreciation of the consequences of it is not open for our review."

THE DEMURRER TO THE INDICTMENT
Eighteen grounds of demurrer challenge the indictment and each count thereof, separately and severally, each ground asserting, "that said indictment is vague, indefinite and defective in that. . ." the indictment "does not allege," "does not sufficiently apprise," "does not inform," "fails to allege," "does not charge," "does not state" or as stated in ground fourteen, "it appears on the face of the indictment that the alleged false statements or omitted material facts by the Defendant were not in connection with the offer, sale or purchase of a security."
The nature and variations of the multitude of conceivable specific wrongs sought to be covered by a "blue sky law" make an indictment based thereon, in most instances, an attractive target for a charge attacking its vagueness. In the first reported criminal case under the original Blue Sky Law of Alabama, as amended by an Act approved October 1, 1920, the sufficiency of the indictment charging an offense in the language of the statute was considered. Raynard v. State, 19 Ala.App. 281, 96 So. 723 (1923). It was therein held:
"The indictment contained eight counts, each of which charged in the language of the statute that the defendant did sell, or offer for sale in this state by means of an advertisement, circulars, or prospectus, or by other form of public offering, speculative securities, etc., without first having obtained a permit as is required by the statutes in such cases made and provided.
"The indictment was sufficient, for in order to constitute a violation of the statute in question the selling or offering for sale of any speculative securities defined in section 2 of said act, such selling or offering for sale must be by means of an advertisement, circular, or prospectus, or by any other form of public offering, without having obtained a permit so to do from the Public Service Commission as the law requires. . . ."
Notwithstanding the general rule that an indictment is sufficient if it charges the elements of a statutory offense in the words of the statute, the appellate courts of Alabama have put at rest any notion that the rule has no exception. Gayden v. State, 262 Ala. 468, 80 So.2d 501, aff'g 38 Ala.App. 39, 80 So.2d 495 (1954). In opinions citing numerous cases bearing upon the line of demarcation between fields for application of the general rule and fields for application of an exception, both courts followed the principle succinctly announced in United States v. Simmons, 96 U.S. 360, 24 L.Ed. 819, 820 (1878):
"Where the offense is purely statutory, having no relation to the common law, it is, `As a general rule, sufficient in the indictment to charge the defendant with acts coming fully within the statutory description, in the substantial words of the statute, without any further expansion of the matter.' 1 Bishop, Crim.Proc., sec. 611, and authorities there cited. But to this general rule there is the qualification, fundamental in the law of criminal procedure, that the accused must be apprised by the indictment, with reasonable certainty, of the nature of the accusation against him, to the end that he may prepare his defense, and plead the judgment as a bar to any subsequent prosecution for the same offense. An indictment not so framed is defective, although it may follow the language of the statute."
In some respects the statute under consideration in this case is similar to a provision of the statute under consideration in Gayden, supra, wherein it was held that counts of an indictment that merely followed the statute, but did not expand thereon, by allegations of facts, were insufficient. There the counts of the indictment *75 were for obtaining "a narcotic drug by fraud, deceit, misrepresentation or subterfuge," etc., in violation of Tit. 22, § 251, Code of Alabama, Recompiled 1958, Tit. 22, § 251. The averment of general fraudulent conduct to different situations in the language of the applicable statutes is common to Gayden and the instant case. On the question whether sufficient specificness to sustain an indictment is to be found in the language of the statute, a controlling portion of the majority opinion in Gayden, 262 Ala. at 474, 80 So.2d at 507, is as follows:
". . . `Fraud,' `misrepresentation' and `concealment of a material fact' and the other crimes charged are vague terms and no civil pleading could stand the test of apt demurrer if a complaint merely averred `plaintiff claims of defendant $100 for that defendant did take such amount of money from plaintiff by "fraud" or by "misrepresentation" or by "concealment of a material fact" or etc.' Certainly property cannot be of a higher value or entitled to greater protection in the eyes of the law than liberty."
Each count of the indictment in this case goes beyond the concise language of the corresponding provision of the statute, by detailing facts constituting the alleged violation. Whether they apprised the accused, "with reasonable certainty, of the nature of the accusation against him, to the end that he could prepare his defense, and plead the judgment as a bar to any subsequent prosecution for the same offense," in accordance with United States v. Simmons, supra, we proceed to consider.
Mr. Justice Simpson, the author of the opinion in Gayden, in referring in an opinion subsequent to the opinions of the Supreme Court and the Court of Appeals in Gayden, said:
"The opinions in the Gayden case are, as applied to this case, inapposite. Beyond the fact that the offense was charged in the language of the statute creating the offense in that case and in this one, there is no analogy. The wrongful act was defined only in general, or `generic,' terms in the statute involved in the Gayden case. The two counts of the indictment were condemned because they did no more than follow those terms, with no allegations added to afford the specificity required. The statute here involved is quite different from that in the Gayden case . . ." Hochman v. State, 265 Ala. 1, 3, 91 So.2d 500, 502 (1956)
The sufficiency of an indictment becomes a constitutional question not only by virtue of the due process provision of the Fourteenth Amendment to the Constitution of the United States and the Alabama Constitution of 1901, § 6, but also by reason of Sixth Amendment protection, that "In all criminal prosecutions, the accused shall enjoy the right to be. . . informed of the nature and cause of the accusation. . ." and substantially the same provision of the Alabama Constitution of 1901, § 6, "That in all criminal prosecutions the accused has a right . . . to demand the nature and cause of the accusation. . ."
In harmony with constitutional requirements, the legislative will is declared in Code of Alabama, Recompiled 1958, Tit. 15, § 232:
"The indictment must state the facts constituting the offense in ordinary and concise language, without prolixity or repetition, in such a manner as to enable a person of common understanding to know what is intended, and with that degree of certainty which will enable the court, on conviction, to pronounce the proper judgment. . ."
This statute, first enacted in Code of 1852, § 3501, obviated to a great extent the strictness previously required in an indictment.
Although the question of who is "a person of common understanding" might invite discord, the legislative expression as a whole is a "common sense" declaration. A person of common understanding, and of a common understanding only, is neither a Solomon nor a simpleton. We take him (her) to be a person of average, usual or ordinary ability to grasp mentally. Mental *76 power or capability is emphasized more than knowledge. Webster's New International Dictionary (2d ed): understanding.
However, the extent of one's knowledge is often a factor to be considered in the assessment of his ability to discern. The hypothetical person is not to be isolated from the surrounding unquestionable and unquestioned facts but is to be considered in the light of them. When one is charged with willful misconduct in a series of acts in the promotion or sale of a security, it is to be assumed that he is not devoid of intelligence on the subject of securities.
In Count I of the indictment it is alleged, inter alia, that defendant "controlled by himself, or jointly with another, the disbursement of said bond money or proceeds" of a bond issue in the amount of four million dollars and that he used "a portion of said bond proceeds for himself, or for another, or for purposes other than" that for which the bond issue was provided. The allegation is and was obviously understandable to him.
In Count II defendant is charged in one particular with willfully making an untrue statement of a material fact in stating that the amount of four million dollars was necessary to construct and equip the Johnnie Walker Project or omitting to state a material fact, in several particulars. A person of common understanding, in the position of defendant as charged, would have known what was intended by the charge.
In Count III under alternative (1), it is alleged that defendant, while holding himself out to be the major stockholder of Johnnie Walker Medical Electronics, Inc., an Alabama corporation, guaranteed the bonds in the amount of four million dollars, but willfully failed to disclose that the corporation had little or no corporate assets. It further charges that defendant while acting as a principal of the Johnnie Walker Project, willfully failed to disclose that defendant's consultants or legal advisers, had been previously permanently enjoined from "participating in the fraudulent sale or purchase of securities." In Count III (2), defendant is charged with establishing himself or accepting the position of, the agent for Johnnie Walker Medical Electronics, Inc., in order to use, and that he did in fact use, a portion of the proceeds of the bond issue as operating capital for an unrelated corporation. To one of common understanding, in the shoes of defendant, the facts were stated in such a manner as to enable him to know what was intended.
We do not say that the counts of the indictment are models of perspicuity, but we are convinced that they are sufficient to overcome the challenge directed to their claimed vagueness, indefiniteness and uncertainty in general.
Eight grounds of the demurrer, 3, 4, 5, 7, 8, 10, 11 and 12, assail each count of the indictment for its failure to set forth the name or identity of the person to whom defendant is alleged to have made false statements, or omitted to state material facts or of the person to whom it is alleged that he was "obligated or required" to make a statement, or of the person to whom defendant "guaranteed said bonds." In some respects some of said grounds are not absolutely accurate. For instance, it is averred that defendant made a false statement of a material fact to "said Industrial Development Board or the investing public, or bond purchaser, to-wit: Walter Poole or other persons."
In upholding the indictment in Hochman, the Supreme Court of Alabama concluded that where the language of the statute itself is sufficiently specific, when incorporated in the indictment, to meet constitutional requirements, the general rule applies and that the field for application of the exception to the rule is where the statute defines the wrong in general, or "generic," terms.
"It is an elementary principle of criminal pleading, that where the definition of an offense, whether it be at common law or by statute, `includes generic terms, it is not sufficient that the indictment shall charge the offense in the same generic terms as in the definition; but it must state the species, it must descend to particular.'" *77 United States v. Cruikshank, 92 U.S. 542, 558, 23 L.Ed. 588, 593.
Without attempting to explain why, there is a remarkable scarcity of reported criminal cases under "blue sky laws" or the like, whether state or federal.[2] This leaves us but little judicial guidance, other than by analogy, for a solution of the questions now before us.
We are without a Code form of indictment under any of the provisions of the Alabama Blue Sky Law as presently codified. However, under such law in effect in 1940, Code forms were provided by the official Code of 1940, Tit. 15, § 259, Forms 4, 96 and 101 as to violations of §§ 7, 8 and 21 of Tit. 53, making it unlawful to advertise or sell unregistered securities or for a dealer to sell securities unless he is registered. Although the Blue Sky Law in force in 1940 has been repealed (Acts of 1959, p. 1318, Act No. 542, § 24), provisions similar to those contained in the repealed law are in the present law under which defendant was indicted.
The particular Code forms of indictment do not purport to be applicable to all unlawful conduct under the Blue Sky Law, but it is to be especially noted that as to the unlawful conduct to which they are applicable, they do not require the name or identity of the person or other legal entity, to whom, by whom, or through whom, the accused advertises or sells.
In enacting the above-mentioned Code forms, as well as other Code forms, the Legislature stated:
"The following forms of indictment, in all cases in which they are applicable, are sufficient; and analogous forms may be used in other cases." Code of 1940, Recompiled 1958, Tit. 15, § 259
Whether the name or identity of persons other than the accused is necessary to sustain the sufficiency of an indictment has been previously resolved on considerations that should govern in the instant case. Generally, where the alleged crime is one necessarily involving an injury to the person or the personal right of another, or damage to property or a property right of another, the name or identity of the other must be stated in the indictment. See cases cited in West Publishing Company's Alabama Digest, Indictments and Informations, 101 (Designation of person injured and others.) and 105 (Ownership, possession, or custody of property).
The reasons the name or identity of other persons is generally required usually disappear when the particular crime charged does not necessarily involve any injury to the person or property of another. As to those that do, it is to be noted that even the Code forms of indictment require in general that the name or identity of the other person be alleged; as to the other kind, the name or identity of the other is not usually required, and, when required, a reason therefor appears, which is not applicable to most of such crimes.
We list, as worthy of note on this point, some of the crimes not involving any injury to person or property of another and the Code forms provided by Code of Alabama, Recompiled 1958, Tit. 15, § 259:
Form 19. Betting at cards, dice, etc. Neither the name nor the identity of the other or others is required.
Form 20. Betting at cards, dice, etc. The name of the operator of the gaming table is not required.

*78 Form 21. Betting on election. The name of the person with whom defendant is alleged to have bet is required. This conforms with the usual rule that the criminal correlate to the accused in a criminal transaction should be identified. Form 22. Betting with minor. The name or identity of the minor is required. Betting with persons other than minors, under some circumstances constitutes a violation of law, but the particular law here alleged to have been violated is not violated unless the other person is a minor. The necessity for the minor's identity is apparent, due to the fact that thereby the right of defendant to show, if possible, that the particular person with whom he is alleged to have bet is not a minor, is preserved.
Form 23. Bigamy. The name of the additional wife is required. Otherwise, the accused could be tried for marrying wife No. 3 when wife No. 2 was intended by the grand jury.
Form 34. Buying, selling, having, etc., prohibited liquors. The name or identity of the other is not required.
Form 52. Emitting and circulating change bills. The name or identity of others not required.
Forms 62 and 63. Forgery. The name or identity of the person intended to be injured is not required.
Form 110. Using firearms while fighting in a public place. The name or identity of another is not required.
The general rule on the subject is as follows:
"The name of a third person connected with the offense, but not essential to its description, need not be set out or alleged to be unknown, where the charge without such statement is sufficiently certain, but unless the necessity has been obviated by statute, or by rule of court, where such a name is necessary to do a description of the offense, it must be stated if known." 42 C.J.S. Indictments and Informations § 142.
"The names of third persons who are necessary parties to the consummation of the offense charged in the indictment or who constitute a necessary part of the offense should, if known, be alleged; but unless a statute requires it, the name of a third person whose identity is not an essential element of an offense or material to the commission thereof need not be stated." Anderson, Wharton's Criminal Law and Procedure, § 781 (1957)
Almost identical is the statement in 41 Am.Jur.2d, Indictments and Information, § 129:
"The name of a third person who constitutes a necessary part of the description of the offense should, if known, be alleged; but the name of a third person whose identity is not a necessary part of the description of the offense need not be alleged." Torcia, Wharton's Criminal Procedure, § 279 (12 Ed. 1975)
In People v. Main, 75 Cal.App. 471, 242 P. 1078 (1926) an indictment was held sufficient that charged defendant with selling shares of stock without having obtained a permit or license to sell, although the indictment did not allege by whom the stock was owned. In State v. Brockman, 39 Idaho 468, 228 P. 250 (1924), an information for a sale of stock of a company which had not complied with the requirements of the Blue Sky Law was held sufficient without stating the name of the purchaser.
The crime charged in the instant case does not necessarily involve any injury to person or property. It may result in injury to property or a property right, but the statute proscribes the evil conduct, whether anyone is injured or not.
Recently the Supreme Court of Alabama has gone exhaustively into the question of the necessity for an indictment to name or identify the other person or persons concerned in criminal transactions. Adkins v. State, 291 Ala. 695, 287 So.2d 451 (1973). There was involved the alleged violation of Code of Alabama (Recompiled 1958), 1971 Cum. Pocket Part, Tit. 22, § 258(47)(a) in selling marihuana. It was held therein that the indictment was not subject to demurrer on the ground that it failed to name or *79 identify the purchaser. In so holding, the Supreme Court, through Mr. Justice Merrill, has given us a collection of cases on the subject of the necessity for the name or identity of third persons, and has furnished persuasive reasons for our holding that none of the counts of the indictment in the instant case is defective by reason of its failure to state the names or identity of third persons.
A case relied upon for the opinion in Adkins is Griffith v. State, 47 Ala.App. 378, 255 So.2d 48, cert. denied, 287 Ala. 735, 255 So.2d 52, cert. den., 405 U.S. 1042, 92 S.Ct. 1317, 31 L.Ed.2d 583, wherein an indictment was upheld against defendant for practicing law after disbarment, which stated neither the name of the client nor the cause for which representation was furnished. It is to be noted in connection with such case that Code Form 85 of Code of Alabama (Recompiled 1958), Tit. 15, § 259, for an indictment charging the practice of medicine or surgery without a license does not require a statement of the name or identity of the patient.
Without attempting to decide whether in some other cases and under different circumstances an indictment charging a violation of Code of Alabama (Recompiled 1958), 1973 Cum.Supp., Tit. 53, § 28, should state the names or identity of persons whom defendant has defrauded, or attempted to defraud, or to whom he has made any material misrepresentation of a fact by commission or omission, we are persuaded that, under the facts alleged, no count of the indictment in the case now before us is subject to valid demurrer on that ground.
It necessarily follows that grounds 10, 11 and 12 of the demurrer setting forth that the indictment does not state the name of the person to whom defendant was "obligated or required" to make a statement or to the person to whom defendant "guaranteed said bonds" are not well taken.
Ground 14 of the demurrer states that "it appears on the face of the indictment that the alleged false statements or material facts omitted by the Defendant were not in connection with the offer, sale or purchase of a security." The indictment expressly charges that they were in connection with the offer, sale or purchase of a security, and we note nothing in the indictment to the contrary.
Ground 2 of the demurrer to the indictment asserts that it does not "sufficiently apprise the defendant of the material facts he allegedly falsely stated or omitted to state concerning the corporate structure, ownership or financial condition of Johnnie Walker Medical Electronics, Inc." The ground is referable to Counts I and II. In all three counts, it is alleged that there were two Johnnie Walker Medical Electronics, Inc., one a Missouri corporation and the other an Alabama corporation. Ground 2 of the demurrer is too vague in not specifying whether it is referable to the one or to the other of the two corporations. Harris v. State, 248 Ala. 389, 27 So.2d 797 (1946); Flanigan v. State, 247 Ala. 642, 25 So.2d 685 (1946); Van Nostrand v. State, 51 Ala.App. 494, 286 So.2d 903, cert. denied, 291 Ala. 799, 286 So.2d 906 (1975). Irrespective of the indefiniteness of the particular ground of demurrer, we are of the opinion that even though perfection in the allegations of an indictment would require more than that there was a willful omission "to state material facts concerning the corporation structure, ownership, or financial condition" of the particular corporation, the failure to do so does not materially affect the sufficiency of Counts I or II of the indictment. Furthermore, it is to be noted that Count III of the indictment alleges that defendant willfully failed to disclose "that said Johnnie Walker Medical Electronics, Inc., a newly formed Alabama corporation, had little or no corporate assets, or that said corporation had little or no funds for said Johnnie Walker project other than said bond proceeds."
Although the validity of a particular count of an indictment is to be tested without reference to other counts of the indictment, it can hardly be said that an accused is not given adequate notice of what he is called upon to defend against in *80 one count of the indictment if it is made perfectly clear by another count thereof.
According to the uncontroverted evidence, including the Articles of Incorporation of Johnnie Walker Medical Electronics, Inc., an Alabama corporation, defendant was the first signer of the Articles of Incorporation; he owned five hundred and thirteen thousand shares of a total of five hundred and fourteen thousand shares of the stock of the corporation; he was its secretary-treasurer and a director. The other two share holders, holding five hundred shares each, paid a total of $500 for their shares; one was defendant's wife. Defendant's shares valued at $256,000 were not paid for in cash but by a transfer of one hundred percent of the outstanding common capital stock of Cardiovascular, Inc., a Missouri corporation.
The uncontroverted evidence also shows that prior to and up to the time of the alleged criminal activity of defendant, Cardiovascular was highly involved, its total assets no more than approximately equaling its indebtedness to Johnnie Walker Medical Electronics, Inc., a Missouri corporation, whose stock had been pledged to a bank in Missouri as collateral for a loan of Johnnie Walker individually or Johnnie Walker Medical Electronics, Inc., a Missouri corporation.
We have no doubt that under the facts alleged in the indictment and under the undisputed evidence in the case, no one was more able than defendant, the owner of a 513/514 interest in Johnnie Walker Medical Electronics, Inc., an Alabama corporation, to be apprised of the specifics of a charge to the effect that he had misrepresented the "corporate structure, ownership, or financial condition" of said corporation. Irrespective of any question as to his guilt of the charge, there can be no doubt that he fully understood its meaning and was not prevented by whatever generality may be ascribed to it, to the extent that truth would permit, from responding to the facts charged in the indictment. In Stinson v. State, 55 Ala.App. 393, 316 So.2d 224, cert. denied, 294 Ala. 771, 316 So.2d 227, we considered the sufficiency of the description of a check alleged to have been feloniously taken so as to constitute robbery. We concluded:
". . . A more definite description could readily have been given in the indictment by stating the name of the bank, the name of the drawer and the name of the payee, but the extent of the definiteness required of an indictment is to be determined in the light of the need therefor. Under all the circumstances here presented, the particular check was adequately described, and no injustice resulted to the defendant by reason of a failure to describe the check in greater detail.
"The evidence showed that defendant never cashed or banked the hundred dollar check, that soon after the commission of the alleged crime he cashed the sixtysix-dollar and fifty-six-cent check and soon thereafter reacquired it by payment of its face value to the then holder thereof and thereafter turned it over to his attorney, who introduced it into evidence on the trial. Defendant's action ... also shows that, even if such a check under some circumstances should have been described with greater detail, defendant had full knowledge of all further details by which it could have been described, that the overruling of the demurrer did not constitute error prejudicial to defendant and that the harmless error principle (Supreme Court Rule 45, Code 1940, Tit. 7, Appendix) should apply."
Even though an indictment does not of itself afford sufficient information to defendant for him to prepare his defense to the charge, he is not injured if he otherwise acquires such information. People v. Grant, 57 Ill.2d 264, 312 N.E.2d 276 (1974); Sizemore v. State, 308 N.E.2d 400 (Ind.App. 1974); People v. Williams, 50 Mich.App. 763, 213 N.W.2d 754 (1973); State v. Lora, 213 Kan. 184, 515 P.2d 1086 (1973); Stull v. State, 230 Ga. 99, 196 S.E.2d 7 (1973). It is clear to us that defendant was fully aware of what to expect relative to the allegation that he omitted "to state material facts *81 concerning the corporate structure, ownership, or financial condition" of the corporate entities named and that no prejudice to defendant resulted from the court's overruling the demurrer addressed to that allegation.
Other grounds of demurrer make the point that the indictment does not allege that defendant had knowledge of facts he is alleged to have misrepresented. However, each allegation is that he "willfully and unlawfully" did so. Such is the language of the statute, chosen deliberately by the Legislature. The State had the burden of showing that the conduct was willful and unlawful. That was the extent of its burden as to the criminality of the conduct. It was not required to allege more than it was required to prove.
We have considered all of the grounds of the demurrer, including grounds 15, 16, 17 and 18, which also assert vagueness and indefiniteness in the indictment. It was not necessary for the indictment to allege, any more than it does, "the manner or the method or the procedure by which defendant caused or allowed the Industrial Development Board to authorize the issuance or sale of bonds in the amount of four million dollars," as urged in ground 15, or for it to inform the defendant "as to how he knew said bonds in the amount of four million dollars were substantially more than was necessary" as urged in ground 16, or to allege that "all of the four million dollar bond issue was to be used solely for the construction and equipment of the Johnnie Walker project" as stated in ground 17. Ground 18 incorrectly states that the indictment "does not charge an offense against the law of the State of Alabama."
We find no error prejudicial to defendant in the action of the trial court in overruling defendant's demurrer to the indictment.

THE OBJECTIONS TO SOME OF THE EVIDENCE
Duly certified copies of injunctions issued against Stewart Hopps, Garet Van Antwerp and Martin Bieber, enjoining them from participating in the fraudulent sale or purchase of securities, were admitted in evidence. The injunction against Bieber was issued March 23, 1971, by the United States District Court for the Northern District of Illinois; the one against Stewart Hopps was ordered September 27, 1973, by the United States District Court for the Southern District of Texas; the one against Van Antwerp was ordered by the United States District Court for the Southern District of Texas on November 5, 1973. Appellant urges that these documents were irrelevant. An objection on that ground in effect was overruled by the trial court. Appellant insists that the evidence failed to show any knowledge by, or notice to, defendant of such injunctions against any of the named persons. Without attempting to resolve that issue at this time, we hold, for the reasons stated hereafter, that the trial court was not in error in overruling the objections on that ground.
The objections on the ground of irrelevancy (a general objection) were not sufficient to preserve for review on appeal the point that it was not shown that defendant had knowledge of the injunctions, Baker v. State, 35 Ala.App. 596, 51 So.2d 376, cert. denied, 255 Ala. 335, 51 So.2d 381 (1951). Additionally, we note that the indictment alleges that defendant willfully and unlawfully failed to disclose information that the said Stewart Hopps, Garet Van Antwerp and Martin Bieber had been permanently enjoined from participating in the fraudulent sale or purchase of securities. The evidence was relevant to that particular averment. The relevancy of evidence is not dependent upon its sufficiency, but only upon its reasonable tendency, to prove or disprove a material fact in issue. Farmers' Mut. Ins. Ass'n of Ala. v. Stewart, 192 Ala. 23, 68 So. 254 (1915); Atlanta & St. Andrews Bay Ry. Co. v. Fowler, 192 Ala. 373, 68 So. 283 (1915); Ensley Holding Co. v. Kelley, 229 Ala. 650, 158 So. 896 (1935); Powell v. State, 5 Ala.App. 75, 59 So. 530 (1912); Smith v. State, 13 Ala.App. 411, 69 So. 406, cert. denied, Ex parte Smith, 193 Ala. 680, 69 So. 1019 (1922); Gaskin v. State, 53 Ala.App. 64, 297 So.2d 388, cert. *82 denied, 292 Ala. 721, 297 So.2d 391 (1974); McClendon v. State, 54 Ala.App. 327, 307 So.2d 723 (1975).

THE SUFFICIENCY OF THE EVIDENCE
Appellant does not press a contention that the evidence is insufficient to warrant a conviction other than in the particular that venue in Mobile County was not established. Nevertheless, we set forth some of the evidence contained in a three-volume transcript consisting of over six hundred pages, which do not include 68 documentary exhibits that had to be certified out of a total of 109 exhibits admitted in evidence. Eighteen witnesses testified on the call of the State. With the exception of one document introduced into evidence by defendant, no evidence was presented on behalf of defendant.
In the early part of 1973 the Mt. Vernon, Alabama, Industrial Development Board was created. In May 1974 it was informed by its attorney that Johnnie Walker Medical Electronics, Inc., a Missouri corporation, was interested in the Mt. Vernon area for a plant, that it would be a medical electronics industry that would hire between fifty-five and sixty employees at the beginning, that it would need between one hundred forty and one hundred fifty acres of land, and that a bond issue of four million dollars would be needed. The Board was favorably impressed. On May 28, 1974, it executed a letter of inducement addressed to Johnnie Walker Medical Electronics, Inc., 3310 Richmond Avenue, Houston, Texas, whereby the Board agreed to acquire a site for the construction of a manufacturing plant and facility, construct and equip a plant and facility at the site, in accordance with plans, specifications, orders and directions from the other party and finance the same by the issuance of Industrial Revenue Bonds "to be guaranteed by you and/or your parent corporation, World Capital Investment Corp., of Houston, Texas." The copy of the inducement letter shown in the record in this case discloses that it was accepted and agreed to on the 29th of May, 1974, by Johnnie Walker Medical Electronics, Inc., by Leonard Manson and signed by him as "Its Treasurer." At the time of the purported date of said signature, Johnnie Walker Medical Electronics, Inc., an Alabama corporation, was one day old, for on May 28, 1974, Articles of Incorporation of Johnnie Walker Medical Electronics, Inc., a corporation, were filed in the Probate Office of Mobile County. They had been signed and verified by defendant, his wife, and Louis Sylvester, the three incorporators, before a notary public in Harris County, Texas, on May 21, 1974.
According to the evidence, defendant did not appear before the Industrial Development Board of the Town of Mt. Vernon. Whether he was in Mt. Vernon, or elsewhere in Mobile County, on May 28 or May 29, 1974, is not definitely disclosed by the evidence, but the likelihood thereof is shown by the evidence that the letter of inducement, addressed to Houston, Texas, was executed in Mobile County only one day before it was accepted in writing by defendant.
The minutes of the meeting of the Industrial Development Board on May 21, 1974, which authorized the letter of inducement, referred to the Johnnie Walker Company as "the Johnnie Walker Medical Electronics, Inc., which is located in Kansas City, Mo., the address being 861 East 55th Street, Kansas City, Mo."
At a meeting of the Industrial Development Board on July 8, 1974, the Board's attorney informed it that the "closing documents for the Johnnie Walker Medical Electronics, Inc., were in order," that the bond closing was scheduled for July 15, 1974, in Andalusia, Alabama, at the Covington County State Bank. The Board "agreed to send its attorney Mr. Garet Van Antwerp and others to Andalusia for the closing." At the meeting the Board authorized the issuance of bonds for the "Johnnie Walker Medical Electronics Company" project in the amount of four million dollars.
There was evidence that defendant chose the Andalusia bank as trustee to handle the proceeds from the bonds after he and the *83 attorney for the Board had gone to the American National Bank in Mobile to obtain its agreement to act as such trustee; they were turned down by the bank for the reason that the bank had not obtained enough financial information concerning the "Johnnie Walker Medical Electronics Company."
The closing of the bond issue took place on July 15, 1974, in Andalusia. A lengthy, comprehensive lease agreement between the Industrial Development Board and the Johnnie Walker Medical Electronics, Inc., an Alabama corporation was executed. Johnnie Walker signed as president and Leonard Manson as sec.-treas. of the electronics company. The Industrial Development Board leased the project site, and all improvements thereon and all personal property to be acquired with proceeds from the sale of bonds, to Johnnie Walker Medical Electronics, Inc., the Alabama corporation, in consideration in part of an agreement by the lessee to pay rent during the continuance of the lease. The lessee executed another instrument whereby it guaranteed to the trustee the principal and interest on all of the bonds to be issued. This guarantee was signed by Johnnie Walker as president of the corporation and attested by defendant as its secretary-treasurer. At the same time, Johnnie Walker, Sr., as president of the lessee, appointed and designated defendant as "Project Supervisor" of the project.
As a small part of the mass of documentary evidence in the case, is a "letter of intent," dated May 5, 1974, addressed to Johnnie Walker Medical Electronics, Inc., Mt. Vernon, Alabama, from Tower Brokerage, Inc., St. Petersburg, Florida, signed by Hugh J. Bell as its president, expressing an "intent to purchase the $4,000,000 Industrial Revenue Bond Issue on your firm to be located in Mt. Vernon, Alabama, . . . at 80% of par value plus accrued interest." The letter of intent has a postscript, "This agreement shall be null and void unless signed copy be received by me on or before June 10, 1974, by certified mail, return receipt requested." Above the postscript in the copy of the letter in the record before us, is the following:
"Accepted and Approved by Johnnie Walker Medical Electronics, Inc.
 "/s/ Leonard Manson
 "Secretary-Treas."
Bonds totaling $2,000,000 of the $4,000,000 issue were sold on the date of closing to Tower Brokerage for $1,600,000. In September 1974 bonds totaling $2,620,000 had been sold to Tower for the sum of $2,096,000. Many of these bonds had by that time been sold by or through Tower to the investing public. From the amount received from Tower for the bonds the trustee bank "set up as escrow interest in the principal and interest account" on the entire bond issue, approximately $670,000-$700,000. The balance of approximately $1,426,000 was placed in the "construction account" for the project.
It was agreed among the trustee, the Industrial Board, and the Electronics Corporation, that a requisition signed by Mr. Van Antwerp and by defendant was required for any disbursement by the trustee of the proceeds in the construction account. Among the requisitions and consequent payments was a requisition signed by Mr. Van Antwerp and defendant for $215,064 for the purchase of the project site. The record shows no special criticism of this payment other than the one hereinabove noted to the effect that more land was bought than was needed for the project.
In addition, $40,000 was paid on a similar requisition to bond counsel to cover their attorneys' fee, and $10,000 to the attorney for the Board. There was and is no issue between the parties as to the propriety of the payment of attorneys' fees to the bond attorneys and to the attorney for the Board. There is some testimony indicating that a smaller fee would have been appropriate.
Other requisitions signed by Mr. Van Antwerp and defendant and honored by the trustee included one for an attorney's fee of $40,000 of Mr. Martin S. Bieber, the attorney for defendant or the attorney for the lessee. There was evidence that it was *84 improper to use trust funds to pay the fee of an attorney for the lessee. On the requisition of defendant and Mr. Van Antwerp there was also paid to Mr. S. B. Hopps the sum of $40,000 as a consultant's fee. There is no evidence tending to justify the payment of a fee to Mr. Hopps from the funds held in trust. On August 5, 1974, on the requisition of defendant and Mr. Van Antwerp, $400,000 was paid to Johnnie Walker Medical Electronics, Inc., the Missouri corporation, for the stated purpose of "research and development." There was considerable evidence to the effect that there was no justification for that payment and there was no evidence to justify the payment. On a similar requisition $100,000 was paid to Hensley Contractors, Inc., the contractor whom the lessee had engaged to construct the plant, as a partial payment. This particular payment will be hereinafter considered further.
Payments in addition to those stated above were made within two months after the bond closing, some of which do not seem to be subject to question, but the State seems to question others. The payments made as shown above, when considered with the other circumstances, are sufficient to show that more than one-half a million dollars was withdrawn from the trust fund by requisitions signed by defendant as one of the requisitionists as to which there is substantial evidence tending to show such money was not used for the purpose of the trust and there is no evidence in the record that it was so used.
There was strong testimony by a securities dealer of fifteen years experience, with no evidence to the contrary, that a reasonable and traditional underwriting fee to be allowed the underwriter of the bond issue in this case would have been from one percent to three and a half percent; that he had never heard of a twenty percent fee "until 1973-74 when we had eight underwriters in Alabama. They were involved and very troublesome and all of them ended in disaster."
Hensley Contractors, Inc., was incorporated on August 20, 1974, by articles of incorporation filed in the Probate Office of Mobile County. Five thousand shares of capital stock were authorized with one thousand shares paid in at one dollar per share. At that time, it had no license as a contractor.
At the time of the trial of the case in May 1975 there was no building on the project site. All that had been done toward the actual construction of the plant was that between three and five acres of the land had been cleared, that is, the undergrowth and brush had been removed. The construction contract between Hensley and the lessee of July 10, 1974, signed for the lessee by defendant, provided for total compensation to the contractor of $850,000. The work was to have commenced on August 20, 1974, and was to have been completed within 220 calendar days after the date of commencement. On September 5, 1974, a requisition for $150,000 to pay for the second phase of the contract was signed by Mr. Van Antwerp and defendant and submitted to the trustee for payment to the contractor. An employee of the trustee called Mr. Van Antwerp and asked for a certification that phase A had been completed, but this certification was never supplied, and the payment was not made.
The record does not clearly reveal the number or the face amount of the bonds that were sold to the public, but there is evidence that they were substantial in number and in amount, that interest on some of them as it became due was requested and refused. Furthermore, the evidence shows that in September 1974, the enterprise came to a standstill; that in accordance with advice of counsel, the trustee stopped honoring requisitions and "transferred all the funds that were left . . . to the United States District Court . . . in Mobile." We do not have the benefit of an accounting as to the face amount of the loss to investors in the bonds, but it is reasonably clear, and there is no contention to the contrary, that the venture as a whole was terminated without tangible results of substantial value, except in the acquisition of a tract of real estate, and that investments *85 therein have been reduced to a financial fiasco, as of the time of trial at least.
The evidence was undisputed that Mr. Van Antwerp, Mr. Hopps and Mr. Bieber had been previously enjoined from participating in the fraudulent sale or purchase of securities. We do not find it necessary to decide whether the defendant had knowledge of such injunctions, but we note from circumstances of his relationship with them as revealed by a superabundance of evidence that he could hardly have been ignorant thereof. Mr. Bieber was defendant's own attorney, which standing alone does not constitute evidence of defendant's knowledge or notice of Mr. Bieber's previous embroilment in legal proceedings relative to his questionable conduct as to securities. The injunctions against Mr. Van Antwerp and Mr. Hopps were issued in the same case pending in Houston, Texas, where defendant was residing while the project in this case was in its formative stages. The circumstantial evidence as a whole, including the basic fact that defendant owned and had the right to control Johnnie Walker Medical Electronics, Inc., the Alabama corporation, and should have had more concern and legitimate interest in the welfare of the Project than anyone else, points strongly to the conclusion that he knew the background and standing of his three closest confidants, with whom for several months he was continuously engaged.
A person's knowledge or notice of a matter may be established by circumstantial evidence. Liberty National Life Ins. Co. v. Weldon, 267 Ala. 171, 196, 100 So.2d 696, 718 (1958); McElroy, Law of Evidence in Alabama, § 45.01(2) (2d ed.).
We are convinced that there is substantial evidence to support the verdict of the jury that defendant is guilty of the crime charged in the indictment. We think this is true as to each count of the indictment, even though it is not necessary for us to so decide, for, as the verdict was a general verdict, it is referable to any count of the indictment supported by the evidence. Such principle applies when, as here, there has been no request for the general affirmative charge as to a particular count not supported by the evidence. Jones v. State, 236 Ala. 30, 182 So. 404 (1937); Latham v. State, 56 Ala.App. 234, 320 So.2d 747, aff., 294 Ala. 685, 320 So.2d 760 (1975); Stover v. State, 36 Ala.App. 696, 63 So.2d 386 (1963); Lee v. State, 19 Ala.App. 569, 99 So. 56 (1924).
We cannot agree with appellant that the evidence fails to show that there was a commission of the crime by defendant in Mobile County. In making this contention, appellant relies heavily upon the evidence that the bonds were sold in Covington County and that other transactions took place in that county. Such circumstances, however, do not limit the venue to Covington County. In implementing the provision of Art. 1, § 6 of the Constitution of Alabama of 1901, which sets forth the right of a defendant to be tried "by an impartial jury of the county ... in which the offense was committed," the Legislature has provided, consonant with such Constitutional provision, as follows:
"When an offense is committed partly in one county and partly in another, or the acts, or effects thereof, constituting, or requisite to the consummation of the offense occur in two or more counties, the jurisdiction is in either county." Code of Alabama (Recompiled 1958), Tit. 15, § 94.
This statute has been uniformly upheld and applied in a number of cases. Prestwood v. State, 87 Ala. 147, 6 So. 392 (1888); Seay v. State, 21 Ala.App. 339, 108 So. 620, cert, denied, 214 Ala. 666, 108 So. 622 (1926); Draughon v. State, 29 Ala.App. 385, 196 So. 290 (1940); Cole v. State, 37 Ala. App. 232, 67 So.2d 64, cert. denied, 259 Ala. 517, 67 So.2d 68 (1953).
During part of the period covered by the indictment and the evidence, defendant lived in Mobile County; he established a mailing address at Mt. Vernon, in Mobile County, the site of the project; he discussed the plan for bonds, more than once, with a Mobile banker; he could hardly have done all he did without many of his actions having been in Mobile County. To defendant, *86 during most of the time involved, Mobile County was Rome, to which all roads led.
Our review of the record convinces us that no error prejudicial to accused occurred on the trial and proceedings in the trial court and that its judgment should be affirmed.
AFFIRMED.
TYSON, P. J., HARRIS, DeCARLO and BOWEN, JJ., and SIMMONS, Supernumerary Circuit Judge, concur.
BOOKOUT, J., recuses himself, as he was a member of the Alabama Securities Commission when the commission investigated this case.

ON REHEARING
PER CURIAM.
In applying for a rehearing, appellant challenges for the first time the composition of the grand jury that indicted defendant and the composition of "the jury venire selected to sit on his case." Defendant had ample opportunity to do so in the trial court. His failure to raise the question there precludes him from successfully raising it on appeal. Even if he had raised it on a motion for new trial, which he did not, there is nothing before us that tends to vitiate or mitigate his waiver of the right to raise the question by his failure to do so at the proper time.
"Consequently, we hold that henceforth a failure by the defendant in a criminal case to raise proper objection to the composition of a grand or petit jury, including, but not limited to, the constitutional ground of the jury selection process, before entering upon the trial of the case on its merits, constitutes a waiver of his right to do so, subject, of course, to the recognized exceptions of fraud and as to matters which were not known, or by the exercise of due diligence, could not have been known, before trial.
"The rationale espoused for the parallel rule in civil cases pertains with equal force in criminal cases: A defendant who has not been misled is not permitted to participate in the selection of the jury without objections, speculate on winning a favorable verdict, and, failing to do so, raise for the first time such questions on a motion for new trial. Fulwider v. Jacob, 221 Ala. 124, 127 So. 818 (1930)." Williams v. State, 342 So.2d 1328 (Ala.), aff'g 342 So.2d 1325 (Ala.Cr.App.)
The application for rehearing is overruled.
OPINION EXTENDED; APPLICATION OVERRULED.
TYSON, P. J., and HARRIS, DeCARLO and BOWEN, JJ., concur.
BOOKOUT, J., recused.
NOTES
[1] 1 Loss, Securities Regulations (2d Ed.)p.25.
[2] In 3 Loss, 1449 (2d Ed. 1961) a collection of 10b-5 criminal cases to 1961 consists of a dozen only.

"By contrast [with administrative and civil judicial proceedings], the criminal aspects of 10b-5 have not been particularly extensive or significant. . . . Few convictions have given rise to published opinions; many of them no doubt were on guilty or nolo pleas. . . ." A. Bromberg, Securities Law; Fraud, SEC 10.3 p. 241 (1975)
Including civil and criminal cases, as late as 1971, it is stated that Gallion v. Alabama Market Centers, Inc., 282 Ala. 679, 213 So.2d 841 (1968), is the "only reported decision under the modern Alabama Blue Sky statute." Rediker, Alabama's "Blue Sky Law"Its Dubious History and Its Current Renaissance. 23 Ala.L. Rev. 667, 696.